# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-07-00090-CR

**Anthony Charles Adams, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF BELL COUNTY, 264TH JUDICIAL DISTRICT
### NO. 59518, HONORABLE MARTHA J. TRUDO, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury convicted Anthony Charles Adams of the offense of aggravated sexual assault of a child. *See* Tex. Penal Code Ann. §§ 22.011(a)(2), 22.021(a)(1)(B)(iii), (2)(B) (West Supp. 2007). The jury assessed punishment at 10 years' imprisonment. In two issues on appeal, Adams challenges the legal and factual sufficiency of the evidence and claims that the district court erred in ordering him to pay court costs and attorney's fees. We will affirm the judgment.

## BACKGROUND

The jury heard evidence that on the night of October 14, 2005, Granisha Sandifer left her three children at Adams's house while Sandifer ran errands. One of the children was A.S., an eight-year-old girl. Also present at the house that night were Adams's wife, Lahoma; Lahoma's adult niece, Anita Thomas; and Anita's husband, Gabriel. A.S. testified that, at some point during the night, all of the adults left the house except for Adams.

A.S. testified that she and her two brothers fell asleep on the couch in the living room. A.S. recounted that, at some point after she had fallen asleep, she awoke to Adams picking her up and taking her into his bedroom. Then, according to A.S., Adams placed her on his bed, pulled down her pants and panties, and "licked" her sexual organ. A.S. testified that she was "half awake and half asleep" while this was happening, but she was certain that she was not dreaming. A.S. recalled that she told Adams to stop but that he would not. A.S. also recalled seeing Adams's head between her legs. A.S. estimated that this happened for "about seven seconds." A.S. testified that after Adams was finished, he told her to pull her pants up and asked her to kiss him. After leaving the bedroom, A.S. immediately went to the phone and called her mother, asking her to pick her up. A.S. testified that Adams then "went outside." A.S. also testified that she had never lied to get someone in trouble and had no reason to get Adams in trouble. When asked by the State if she was "100 percent sure" about what happened that night, A.S. answered, "Yes."

When Sandifer arrived at the house to pick up her children, A.S. ran to her and hugged her. According to Sandifer, A.S. was crying. Sandifer testified that A.S. immediately told her what happened. Sandifer explained to the jury what A.S. told her, and Sandifer's explanation was consistent with A.S.'s testimony. Sandifer testified that after A.S. told her what happened, she took her children back to her home and called the police. She then returned to Adams's house with A.S. so that her daughter could identify Adams to the police.

One of the investigating officers was Officer Robert Rush of the Killeen Police Department. Officer Rush spoke with A.S., and he testified that she told him what happened. Rush explained to the jury what A.S. told him, and Rush's explanation was consistent with

2

A.S.'s testimony. According to Rush, A.S. "seemed believable." He testified that he did not doubt her credibility. Rush also testified that he asked A.S. if she could describe anything in the room where the incident happened. A.S. described a television set in Adams's bedroom. Rush explained that he had seen the television himself, and it was just as A.S. described it. Rush further testified about statements Adams made to him. According to Rush, Adams changed his story. At first, Adams told Rush that he was the only adult at the house. Then, Adams told him that there were other adults present. Rush testified that, at one point, Adams kept talking about how much trouble he was in and how his military career was over.

Anita Thomas returned to the house while the police were conducting their investigation. Thomas testified that she observed A.S. shaking and crying, and that A.S. appeared traumatized and scared. Thomas also testified that she had known A.S. for about two months prior to the incident and that, during that time, A.S. had never done anything that made Thomas believe that A.S. was a liar. Thomas further testified that on two occasions, once on the night of the incident and once approximately two weeks later, she asked Adams, "Why he did that." According to Thomas, instead of denying the accusation, Adams answered that he did not know why he did it.

Early the next morning, certified Sexual Assault Nurse Examiner Debra Kleypas interviewed and examined A.S. Kleypas testified that she had performed over 500 exams in the five years since she had been certified, and 130 of them were performed on children younger than 12 years of age. Kleypas testified that A.S. told her what happened, and she explained to the jury what A.S. told her. Kleypas's description of what A.S. told her was consistent with A.S.'s testimony. According to Kleypas, there was nothing in A.S.'s story that led her to believe that

3

A.S. may have been lying. Kleypas also testified that she did not observe any physical injuries to A.S. The lack of injuries was to be expected, according to Kleypas, because of the nature of the assault. She further testified that, in 85 percent of sexual assault cases, there is no evidence of injury.

The State's final witness was Officer Ronnie Supak of the Killeen Police Department, the officer who headed the investigation. Officer Supak testified that, during the course of the investigation, there was nothing to lead him to believe that the incident happened any other way than exactly as A.S. told him it happened.

The defense called two witnesses, Adams and his wife, Lahoma. Lahoma testified that she believed A.S. was lying. Lahoma also testified that she believed in her "gut" that her husband was innocent. Adams denied the allegations against him, and he testified that he had "no idea" why A.S. would tell a story that was not true.

The jury convicted Adams of aggravated sexual assault of a child and assessed punishment at 10 years' imprisonment. This appeal followed.

## DISCUSSION

**Evidentiary sufficiency**

In his first issue, Adams challenges the legal and factual sufficiency of the evidence supporting his conviction. When there is a challenge to the legal sufficiency of the evidence to sustain a criminal conviction, we consider whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Vodochodsky v. State*, 158 S.W.3d 502, 509 (Tex. Crim. App. 2005). We review all the evidence in the light most favorable to the verdict and assume that the trier of fact resolved conflicts in the testimony, weighed the evidence,

4

and drew reasonable inferences in a manner that supports the verdict.  *See Rollerson v. State*, 227 S.W.3d 718, 724 (Tex. Crim. App. 2007); *Shams v. State*, 195 S.W.3d 346, 347 (Tex. App.—Austin 2006, pet. ref'd) (citing *Griffin v. State*, 614 S.W.2d 155, 159 (Tex. Crim. App. 1981)).  It is not necessary that every fact point directly and independently to the defendant's guilt, but it is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances.  *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).  We must consider all the evidence, rightly or wrongly admitted, that the trier of fact was permitted to consider.  *See Conner v. State*, 67 S.W.3d 192, 197 (Tex. Crim. App. 2001).

In a factual sufficiency review, we view the evidence in a neutral light and ask whether a jury was rationally justified in finding guilt beyond a reasonable doubt.  *See Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006).  We then determine whether the evidence supporting the verdict is so weak that the verdict is clearly wrong and manifestly unjust or whether the verdict is against the great weight and preponderance of the conflicting evidence.  *Id.* at 415.  We will not reverse a case on a factual sufficiency challenge unless we can say, with some objective basis in the record, that the great weight and preponderance of the evidence contradicts the jury's verdict.  *Id.* at 417.

A person commits the offense of sexual assault of a child if he intentionally or knowingly causes the penetration of the anus or sexual organ of a child by any means.  Tex. Penal Code Ann. § 22.011(a)(2)(A).  The offense is aggravated if the child is younger than 14 years of age.  *Id*. § 22.021(a)(1), (2)(B).

In cases involving sexual offenses against children, the testimony of the child victim alone is legally sufficient to support a conviction. *See* Tex. Code Crim. Proc. Ann. art. 38.07 (West 2005); *Garcia v. State*, 563 S.W.2d 925, 928 (Tex. Crim. App. 1978); *Lee v. State*, 186 S.W.3d 649, 655 (Tex. App.—Dallas 2006, pet. ref'd); *Hellums v. State*, 831 S.W.2d 545, 547 (Tex. App.—Austin 1992, no pet.). Here, A.S. testified that Sparks "licked" her sexual organ. The jury could have rationally credited this testimony, especially in light of testimony from other witnesses that A.S. "seemed believable," was not a liar, had no reason to get Adams in trouble, and said nothing that caused the people to whom she reported the abuse to doubt the truth of what she was telling them.

Adams complains that A.S.'s testimony was inconsistent, noting that there were times in her testimony when A.S. first answered "no" to questions asked by the State, and then, once the State rephrased the question, answered "yes." For example, at one point the State asked A.S., "While Anthony was doing this, could you feel it?" A.S. first answered, "No." The State then rephrased the question, "When he was licking your private could you feel it?" This time, A.S. answered, "Yes." However, the jury was free to resolve any apparent inconsistencies in A.S.'s testimony in favor of the State. *See Ray v. State*, 106 S.W.3d 299, 302 (Tex. App.—Houston [1st Dist.] 2003, no pet.). Furthermore, the jury could have rationally determined that whatever difficulty A.S. was having in answering the State's questions was not due to a lack of truthfulness, but to the traumatic nature of what happened to her and the fact that she was only eight years old when it happened and ten years old when she was testifying. Additionally, the jury could have credited evidence tending to show that A.S. provided a consistent description of the

incident to her mother, Officer Rush, and the examining nurse on the night of the offense. The jury also could have credited A.S.'s testimony describing the television set in Adams's bedroom, which was consistent with Rush's observations about the television, as evidence that A.S. was telling the truth about what happened.

Adams also places significance on the fact that A.S. admitted that she was "half awake and half asleep" when the assault occurred. However, A.S. testified that she was certain that she was not dreaming. In fact, when the State asked A.S. if she was "100 percent sure" of what happened to her, A.S. answered, "Yes." Furthermore, A.S. testified that she was able to see Adams's head between her legs. The jury could have credited this testimony as evidence that A.S. was awake enough to know what was happening to her and who was assaulting her.

Adams further argues that there was no DNA evidence in this case. While this is true, there is no requirement that a conviction be supported by DNA evidence. *See Harmon v. State*, 167 S.W.3d 610, 614 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd). In fact, Nurse Kleypas testified that it was not unusual for there to be no DNA evidence in sexual assault cases, because DNA evidence is often inadvertently washed or wiped away prior to the physical examination. The jury could have rationally chosen to disregard the lack of DNA evidence and focus instead on the other evidence in the case.

Finally, Adams asserts that there was no evidence of penetration. We disagree. This element of the offense is satisfied by proof of any penetration, no matter how slight. *Cowan v. State*, 562 S.W.2d 236, 238 (Tex. Crim. App. 1978); *Murphy v. State*, 4 S.W.3d 926, 929 (Tex. App.—Waco 1999, pet. ref'd). Penetration may be proved by circumstantial

evidence. *Nilsson v. State*, 477 S.W.2d 592, 595 (Tex. Crim. App. 1972). Contact with the female sexual organ in a manner a reasonable person would consider more intrusive than contact with the outer vaginal lips constitutes penetration. *Vernon v. State*, 841 S.W.2d 407, 409 (Tex. Crim. App. 1992). Penetration of the vaginal canal is not required. *See id*. A.S. testified that Adams "licked her private." When asked by the State to clarify what she meant by this, A.S. testified that she was referring to her vagina. A.S. also testified that this occurred for "about seven seconds." Nurse Kleypas testified that A.S. told her that Adams "used his tongue"and "was licking her private part." The jury could have rationally inferred from this testimony that Adams contacted A.S.'s sexual organ with his tongue in a manner a reasonable person would consider more intrusive than contact with the outer vaginal lips. Viewing the above evidence in the light most favorable to the verdict, we hold the evidence is legally sufficient to support the conviction.

When considering the evidence in a neutral light, we reach the same conclusion regarding the factual sufficiency of the evidence. We cannot say, with some objective basis in the record, that the great weight and preponderance of the evidence contradicts the jury's verdict. Adams denied the allegations against him, and his wife testified that she believed in her "gut" that Adams was innocent. However, the jury is the sole judge of the credibility of the witnesses and the weight to be given the evidence, and may choose to believe all, some, or none of it. *Margraves v. State*, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000); *Rachal v. State*, 917 S.W.2d 799, 805 (Tex. Crim. App. 1996); *Skillern v. State*, 890 S.W.2d 849, 879 (Tex. App.—Austin 1991, pet. ref'd). Thus, the jury is permitted to believe or disbelieve any part of the testimony of any witness. *Jones v. State*, 984 S.W.2d 254, 258 (Tex. Crim. App. 1998).

The jury heard evidence that when Anita Thomas asked Adams why he did it, rather than deny the accusation, Adams answered that he did not know why he did it. Officer Rush testified that Adams repeatedly stated how much trouble he was in and how his military career was over, statements from which the jury could rationally infer a consciousness of guilt. Rush also testified that Adams "changed his story." As for the testimony of Adams's wife, Lahoma, the State elicited testimony from her on cross-examination about her health problems and health-care costs. From this testimony the jury could rationally infer that Lahoma's testimony was self-serving because she needed Adams to be acquitted so that he could continue to provide for her financial needs. The jury also could rationally infer that because Lahoma was not present when the incident happened, she had no objective basis on which to base her "gut" feeling that her husband was innocent. Furthermore, the State called Officer Supak to testify in rebuttal that Lahoma approached him during a court recess and complained about why the State was making such a "big deal" about what happened. Officer Supak testified that Lahoma's statement to him caused him to question her credibility. In her testimony, Lahoma blamed A.S. for the incident and characterized her as "trash." For these and other reasons, the jury could have rationally rejected the testimony of Adams and his wife.

We overrule Adams's first issue.

**Court costs and attorney's fees**

In his second issue, Adams asserts that the district court erred in ordering him to pay

court costs and attorney's fees as a condition of his parole. This Court has repeatedly held that trial courts are generally without authority to order terms and conditions of parole.[1] However, the record in this case reflects that the district court did not impose any terms or conditions of parole, either during sentencing or in its written judgment of conviction. Instead, the district court ordered Adams to pay court costs, attorney's fees, fines, and restitution "after release from incarceration." As long as such payments were not imposed as a term or condition of parole, the district court was statutorily authorized to order such payments. *See* Tex. Gov't Code Ann. § 102.021 (West Supp. 2007) (requiring person convicted of offense to pay court costs); Tex. Code Crim. Proc. Ann. arts. 26.05(g) (West Supp. 2007) (authorizing trial court to order payment of court-appointed attorney's fees), 42.037 (West Supp. 2007) (authorizing trial court to order payment of restitution), 42.15(b)(2) (West 2006) (authorizing trial court to direct defendant to pay fines and costs "at some later date"), 42.16 (West 2006) (authorizing trial court to order collection of costs).

Because the district court did not impose any terms or conditions of parole, we overrule Adams's second issue.

---

[1] *See, e.g.*, *Rendon v. State*, No. 03-06-00671-CR, 2007 Tex. App. LEXIS 7234, at *10-11 (Tex. App.—Austin Aug. 31, 2007, no pet.) (mem. op., not designated for publication); *Bitterman v. State*, No. 03-06-00386-CR, 2007 Tex. App. LEXIS 7235, at *13-14 (Tex. App.—Austin Aug. 28, 2007, pet. dism'd) (mem. op., not designated for publication); *Davis v. State*, No. 03-06-00370-CR, 2006 Tex. App. LEXIS 10328, at *2 (Tex. App.—Austin Dec. 1, 2006, no pet.) (mem. op., not designated for publication); *Terrell v. State*, No. 03-06-00250-CR, 2006 Tex. App. LEXIS 9780, at *13-14 (Tex. App.—Austin Nov. 10, 2006, no pet.) (mem. op., not designated for publication); *Rushin v. State*, No. 03-06-00068-CR, 2006 Tex. App. LEXIS 6693, at *10 (Tex. App.—Austin July 28, 2006, pet. ref'd) (mem. op., not designated for publication).

**CONCLUSION**

Having overruled Adams's issues on appeal, we affirm the judgment of the district court.

_____

Bob Pemberton, Justice

Before Justices Patterson, Puryear and Pemberton

Affirmed

Filed: May 15, 2008

Do Not Publish

11